No. 03-109

IN THE SUPREME COURT OF THE STATE OF MONTANA

2004 MT 334

STATE OF MONTANA,

Plaintiff and Respondent,

v.

KENNETH SNELL,

Defendant and Appellant.

APPEAL FROM:    District Court of the Fourth Judicial District,
In and for the County of Missoula, Cause No. DC-99-13969,
The Honorable Douglas G. Harkin, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Jeffrey T. Renz; Jeanine Blaner, Intern; Colin M. Stephens, Intern; School
of Law, University of Montana, Missoula, Montana

For Respondent:

Hon. Mike McGrath, Attorney General; Pamela D. Bucy,
Assistant Attorney General, Helena, Montana

Fred Van Valkenburg, Missoula County Attorney; Karen S. Townsend,
Deputy County Attorney, Missoula, Montana

Submitted on Briefs:  January 24, 2004

Decided:  November 23, 2004

Filed:

_____
Clerk

Justice Jim Regnier delivered the Opinion of the Court.

¶1 This Court issued its original Opinion in this case on September 14, 2004. *See State v. Snell*, 2004 MT 258, 323 Mont. 84, ___P.3d ___ (*Snell I*). Snell filed a Petition for Rehearing on September 24, 2004. The State filed its Objections to the Petition for Rehearing on September 30, 2004. Snell raised two issues in his Petition. First, he maintained this Court overlooked his affidavit wherein he made affirmative statements that constitute the necessary direct evidence of the constitutional infirmity of his prior Driving Under the Influence (DUI) convictions. Second, he argued this Court erroneously applied harmless error analysis in direct conflict with this Court's decision in *State v. Crawford*, 2003 MT 118, 315 Mont. 480, 68 P.3d 848. On November 4, 2004, we granted Snell's Petition for Rehearing and withdrew *Snell I*. We now replace *Snell I* with this superceding Opinion.

¶2 On October 28, 1999, an Information charged Kenneth Snell (Snell) with operating a motor vehicle while under the influence of alcohol or drugs, fourth offense, and driving while license suspended or revoked, a misdemeanor. A Missoula County jury returned a guilty verdict on both charges. The Fourth Judicial District Court sentenced Snell and entered judgment on September 19, 2002. Snell appeals. We affirm in part and reverse in part. We restate the following issues on appeal:

¶3 1. Whether the District Court erred when it denied Snell's motion to dismiss.

¶4 2. Whether the District Court properly admitted the preliminary alcohol screening test (PAST) evidence.

¶5 3. Whether the District Court properly allowed a law enforcement officer to offer

2

testimony regarding Snell's intoxication level even though the officer was not listed as an expert witness prior to trial.

BACKGROUND

¶6 After leaving the Rock Creek Testicle Festival in the early morning hours of September 19, 1999, Kenneth Snell drove west on Interstate 90 between Turah and East Missoula with his wife, mother-in-law and another passenger. As he traveled eastbound on Interstate 90, Montana Highway Patrol Officer Danny Pat Harrison (Officer Harrison) observed Snell traveling too close behind another car and noticed he failed to dim his bright lights for oncoming traffic. Officer Harrison turned to follow Snell's car and watched it noticeably weave within the traffic lane. As a result of his observations of the traffic violations and weaving, Officer Harrison stopped Snell, and while questioning him in the patrol car, noted Snell smelled of alcohol and had bloodshot eyes. Snell told the officer he had been drinking beer. Officer Harrison read Snell the required PAST implied consent warning and Snell provided a breath sample on an Alco-Sensor III, also known as a PAST. A PAST is also referred to as a preliminary breath test, or PBT. He scored a .168, above the legal limit of .10. However, Snell refused to perform the field sobriety tests. Officer Harrison arrested Snell and transported him to the Missoula County jail for further processing.

¶7 Upon arrival at the detention center, Officer Harrison discovered there were five officers ahead of him waiting to process DUI drivers, which included the use of an in-station Intoxilyzer 5000. Officer Harrison estimated the wait to be at least an hour and a half, so they returned to the patrol car where Officer Harrison again read Snell the implied consent

3

advisory and asked him to submit to another PAST on the Alco-Sensor III. Snell consented and scored a .148. The District Court later excluded this second test because the breath sample was seized unlawfully as only one PAST is allowed to be taken. Officer Harrison issued Snell two tickets and drove him home.

¶8 On October 28, 1999, the State charged Snell with Driving While License Suspended or Revoked, a misdemeanor. Based upon three prior DUI convictions, the State also charged Snell with his fourth offense of DUI, a felony. Snell pled not guilty to both charges. On January 27, 2000, he filed a motion *in limine* to exclude the PAST results. The District Court held an evidentiary hearing on the admissibility of the results where it heard testimony from two experts concerning the Alco-Sensor III. The District Court denied Snell's motion and permitted the State to introduce the PAST evidence. In admitting the evidence, the court stated that any variables in the testing go to the weight, not the admissibility, of the evidence.

¶9 A jury trial held in District Court on October 10-11, 2001, resulted in two guilty verdicts, one for felony DUI and one for misdemeanor driving while license suspended.

¶10 Subsequent to the jury verdict but prior to sentencing, Snell filed a motion to dismiss for lack of jurisdiction claiming two of his three previous DUI convictions used to enhance punishment were constitutionally infirm. Snell claimed his DUI convictions from 1988 and 1990 were constitutionally infirm because the court did not provide him with court-appointed counsel in those cases. Notably, he stated in his affidavit that the same justice of the peace (JP) heard each conviction, but upon investigation, it was determined that, in fact, two separate JPs heard each case. He pled guilty to the charges in both cases without consulting an attorney.

4

¶11 On May 2, 2002, the District Court held an evidentiary hearing to address Snell's motion to dismiss. Snell testified that on both occasions the JP only asked him how he wished to plead without explaining his rights, specifically that he was entitled to legal representation. On cross-examination, Snell was questioned at length about the colloquies that took place between himself and the JP prior to entering his pleas in the 1988 and 1990 convictions. Snell testified he was as positive of all his testimony as he was that he only appeared before one judge. Contrary to Snell's memory, two different JPs presided over his 1988 and 1990 cases.

¶12 Judge Carol Chagnon, the JP who presided over Snell's 1990 guilty plea, testified about her regular practice of advising all defendants of their rights, including specifically stating that they have the right to be represented by an attorney. When concluding that defendants did waive their rights, she would first ask them if they understood their rights and if they needed more time to seek legal counsel to understand their rights. She testified that she recalled going through a lengthy procedure to ensure defendants knew that by entering a guilty plea, as Snell did, they were waiving their right to an attorney.

¶13 Judge Evelyn Donahue, the JP who presided over Snell's 1988 DUI proceeding, died in 1989, therefore Judge Chagnon testified as to JP Donahue's practices. Judge Chagnon testified that JP Donahue went through the same particular pains to ensure she advised each defendant of his rights, fully understood his rights and comprehended the effect of entering a guilty plea as waiving constitutional rights. The District Court determined the routine and practice of the convicting courts regarding administering advice and obtaining a waiver of rights supported an inference that the JPs advised Snell of his right to counsel on both

5

occasions and that he waived this right.

¶14 Attorneys Daniel Boucher and Robert Peterson testified at the hearing on behalf of Snell. Both appeared before JP Donahue just prior to her retirement and prior to her death. They testified about JP Donahue's practice and custom of not fully or completely advising defendants of their right to counsel.

¶15 The District Court denied Snell's motion to dismiss and found the two prior DUI convictions constitutionally valid, thus the State could use them to enhance his punishment in this case. The District Court sentenced Snell on August 13, 2002, and September 10, 2002, entering judgment on September 19, 2002. Snell appeals the denials of his motions to dismiss and *in limine* and the admission of certain opinion testimony offered by Officer Harrison.

STANDARD OF REVIEW

¶16 "A court's resolution of an issue involving a question of constitutional law is a conclusion of law which we review to determine whether the conclusion is correct." *City of Missoula v. Robertson*, 2000 MT 52, ¶ 14, 298 Mont. 419, ¶ 14, 998 P.2d 144, ¶ 14.

¶17 This Court's standard of review of rulings on the admissibility of evidence, including oral testimony, is whether the district court abused its discretion. *See State v. Castle*, 1999 MT 141, ¶ 11, 295 Mont. 1, ¶ 11, 982 P.2d 1035, ¶ 11. The determination of whether evidence is relevant and admissible is left to the sound discretion of the trial judge and will not be overturned absent a showing of abuse of discretion. *State v. Monaco* (1996), 277 Mont. 221, 225, 921 P.2d 863, 866. A district court's ruling on a motion *in limine* is an evidentiary ruling and the court has broad discretion in determining whether evidence is

6

relevant and admissible, and as such, we will not overturn a district court's determination absent an abuse of that discretion. *Crawford*, ¶ 7.

¶18 The grant or denial of a motion to dismiss in a criminal case is a question of law which we review *de novo* on appeal. *State v. Weldele*, 2003 MT 117, ¶ 13, 315 Mont. 452, ¶ 13, 69 P.3d 1162, ¶ 13. Our standard of review is plenary, and we determine whether a district court's conclusion is correct. *Weldele*, ¶ 13.

## DISCUSSION

### ISSUE ONE

¶19 Whether the District Court erred when it denied Snell's motion to dismiss.

¶20 Snell relies upon *State v. Howard*, 2002 MT 276, 312 Mont. 359, 59 P.3d 1075, to contend that his 1988 and 1990 DUI convictions were constitutionally infirm. Snell argues that because *Howard* requires an express waiver of the right to counsel by an unrepresented defendant as a condition precedent to a DUI guilty plea, *see Howard*, ¶ 18, his previous DUI convictions were unconstitutional because he never expressly waived his right to counsel. Additionally, he suggests the District Court allegedly relied upon pre-hearing affidavits as opposed to hearing testimony, thus it erred when it concluded Snell's two DUI convictions were constitutionally valid.

¶21 Furthermore, Snell contends the court erred when it applied Rule 406, M.R.Evid., and allowed habit evidence regarding Judge Donahue's practices when her health failed significantly in 1988, affecting her ability to perform her duties as a JP. Finally, Snell asserts that before he can waive his right to counsel, the court is required to admonish him of the dangers and disadvantages of self-representation and the District Court made no finding on

7

this question, therefore it erred.

¶22 The State maintains the JPs properly advised Snell of his right to counsel, advised him this right would be waived upon entry of a plea and questioned him as to whether or not he wanted to plead guilty, thus waiving his rights. Because Snell acknowledged he wanted to plead guilty and proceeded voluntarily, the State claims he waived his right to counsel, and therefore the 1988 and 1990 DUI convictions were constitutionally firm. The State also contends Snell's argument regarding reliance on inadmissible affidavits is misplaced and asserts there is ample evidence from the hearing to support the court's determination.

¶23 Finally, while recognizing that a superficial reading of *Howard* would require reversal of this case, the State asserts *Howard* merely put courts of limited jurisdiction on notice that this Court prefers express waivers of right to counsel; it did not impose a specific requirement for an express waiver, in the absence of which, the justice court plea would be constitutionally infirm. The State alludes to re-examination of *Howard* because a superficial reading–anything less than an express waiver of right to counsel produces constitutionally infirm convictions–creates particularly harsh and rigid results.

¶24 It is well established that the Sixth Amendment of the United States Constitution and Article II, Section 24 of the Montana Constitution safeguard the fundamental right to the assistance of counsel at all critical stages of the criminal process. *Maine v. Moulton* (1985), 474 U.S. 159, 170, 106 S.Ct. 477, 484, 88 L.Ed.2d 481; *State v. Craig* (1995), 274 Mont. 140, 148, 906 P.2d 683, 688. Furthermore, the court will appoint impecunious defendants an attorney at public expense. *State v. Okland* (1997), 283 Mont. 10, 14, 941 P.2d 431, 433. However, this fundamental right to counsel does not extend to a defendant who waives such

8

right. *Okland*, 283 Mont. at 14, 941 P.2d at 433. This Court has recognized that a defendant may waive his right to counsel and exercise his right to represent himself when such decision is made voluntarily, knowingly and intelligently. *State v. Insua*, 2004 MT 14, ¶ 20, 319 Mont. 254, ¶ 20, 84 P.3d 11, ¶ 20. We focus, not on what a defendant was told, but on a determination that a defendant understands his decision and proceeds voluntarily. *Insua*, ¶ 20.

¶25 It is also well settled that the State may not use a constitutionally infirm conviction to support an enhanced punishment, such as felony DUI. When a defendant attacks a prior criminal conviction that can be used to enhance punishment, a presumption of regularity attaches to such conviction. *State v. Moga*, 1999 MT 283, ¶ 11, 297 Mont. 1, ¶ 11, 989 P.2d 856, ¶ 11. The defendant may overcome the presumption with direct evidence of irregularity. *Weldele*, ¶ 16. Once a defendant produces such direct evidence, the burden then shifts to the State to prove by a preponderance of the evidence that it did not obtain the prior conviction in violation of the defendant's rights. *State v. Peterson*, 2002 MT 65, ¶ 6, 309 Mont. 199, ¶ 6, 44 P.3d 499, ¶ 6.

¶26 Here, because a presumption of regularity attached to Snell's 1988 and 1990 convictions, the first issue before the District Court, and now this Court, is whether Snell produced direct evidence of a constitutional violation sufficient to shift the burden to the State. The District Court noted in its 10th Finding of Fact that Snell's affidavit in support of his motion to dismiss stated that he indicated minimal recall of the court proceedings in 1988 and 1990. In his Petition for Rehearing, Snell contends the affidavit does not suggest reservations about recall or memory, but was rich with detail.

9

¶27 We agree with Snell that his affidavit does not contain a direct statement that he had minimum recall of the court proceedings in 1988 and 1990. However, Snell personally testified before the District Court at the May 2, 2002, hearing. During cross-examination, he was questioned at length about the proceedings in 1988 and 1990. He testified, as he did by affidavit, that he appeared before the same judge in both instances. In fact, Snell appeared before two different judges. The judges differed in age by over twenty years, were of significantly different physical stature and with different color hair. Judge Chagnon testified that no one could mistake one from the other.

¶28 The District Court was impressed by Snell's inability to recall that he appeared before two different judges who were so different in appearance. The District Court ultimately found Snell's inability to recall facts about the judges cast considerable doubt on his ability to recall other critical details about the 1988 and 1990 proceedings. We have always stated that the credibility of witnesses is exclusively within the province of the trier of fact. *Moga,* ¶ 14. Although the District Court was not convinced Snell provided credible direct evidence to shift the burden to the State, it went on to conclude that Snell's attorney witnesses provided enough evidence to meet the requirement of direct evidence of a constitutional infirmity. In this regard, the District Court erred.

¶29 "Direct evidence" is that which proves a fact without an inference or presumption and which in itself, if true, establishes that fact. Section 26-1-102(5), MCA. "Circumstantial evidence" is that which tends to establish a fact by proving another and which, though true, does not itself conclusively establish that fact but affords an inference or presumption of its existence. Section 26-1-102(1), MCA.

¶30 Snell had the burden to prove, by *direct evidence,* that he did not voluntarily, knowingly and intelligently waive his right to counsel, in order to rebut the presumption of regularity. The District Court found that Snell's inability to recall facts about the judges involved in both prior DUI cases cast considerable doubt on his ability to recall other critical details surrounding his 1988 and 1990 pleas of guilty to DUI. The District Court correctly concluded Snell's testimony was not sufficient to overcome the presumption of regularity. It should have stopped there.

¶31 Therefore, given the specific circumstances surrounding this case, we determine the District Court's conclusion that Snell's 1988 and 1990 DUI convictions were constitutionally firm was correct. Snell did not overcome the presumption of regularity through direct evidence. We hold the District Court did not err in denying Snell's motion to dismiss. Accordingly, we affirm the District Court's holding.

ISSUE TWO

¶32 Whether the District Court properly admitted the preliminary alcohol screening test (PAST) evidence.

¶33 Snell argues the District Court abused its discretion when it denied his motion *in limine*, which questioned the reliability of the PAST and contended it was inadmissible as evidence of his guilt. The State asserts the PAST results were properly admitted because it is relevant evidence that is scientifically reliable and the results would not be prejudicial to Snell. We agree with Snell.

¶34 In *State v. Strizich* (1997), 286 Mont. 1, 12, 952 P.2d 1365, 1372, we held PAST results are not admissible as evidence of guilt in a criminal trial because the PAST instrument

11

is unreliable under field conditions. In *Weldele*, we affirmed *Strizich* and concluded the PAST, as currently administered, remains statistically unreliable. We noted:

> [b]ecause the statistical result of such a test could upon admission at trial determine guilt, the test result must be demonstrably accurate. This is not to say that we will never approve trial admission of this evidence. The State may take the opportunity at any time to establish PBT reliability. If the State in any given case establishes that the PBT results it seeks to admit are reliable and accurate, the results could then be admissible if they otherwise satisfy all other requirements for admissibility.

¶35 *Weldele*, ¶ 57. Considering the many factors that may influence the result of a PAST such as regulation, calibration, temperature, humidity, and officer training, combined with the potentially inappropriate evidentiary weight the PAST result may receive, the State has the burden of offering scientific and expert testimony to firmly establish the PAST reliability and accuracy. *Weldele*, ¶¶ 55-58.

¶36 In *Crawford*, we relied on *Weldele* for our analysis of the PAST at issue there. Similar to *Weldele*, we concluded the State did not offer scientific evidence establishing the consistent reliability and accuracy of the PAST and the admission of the PAST results as evidence of intoxication was an "erroneous legal conclusion which led the District Court to abuse its discretion . . . ." *Crawford*, ¶ 13.

¶37 In the case *sub judice*, the District Court held an evidentiary hearing to determine whether the PAST used in this case met the standard for admissibility as evidence of guilt in a criminal DUI trial. After extensive discussion of PAST technology and hearing expert testimony, the court allowed admission of the PAST evidence pursuant to Rule 702, M.R.Evid., and *Barmeyer v. Montana Power Co.* (1983), 202 Mont. 185, 657 P.2d 594, *overruled on other grounds by Martel v. Montana Power Co.,* 231 Mont. 96, 752 P.2d 140.

12

However, the court held the evidentiary hearing in 2001, prior to our 2003 *Weldele* decision. In *Weldele*, we left the door open for the State to establish PAST reliability so the evidence would be admissible. *Weldele*, ¶ 57. Here, the State presented virtually the same evidence it did in *Weldele*, with the exception of one additional study of the Alco-Sensor III from the Idaho Department of Health and Welfare which determined, among other things, that *weekly* calibration of the instruments helps to ensure accuracy, taking into account the stability of the instrument and the many variables which may influence a reading. In both *Weldele* and in this case, a breath specialist calibrated the PAST on a *monthly* basis. After a review of the record, we conclude the State failed to refer to new evidence that demonstrates the reliability of the Alco-Sensor III and we are not satisfied the evidence presented sufficiently established PAST accuracy and reliability so the State could use the PAST for more than probable cause purposes.

¶38 While the District Court correctly excluded the second Alco-Sensor III test given to Snell, when applying *Weldele* and *Crawford*, we conclude the District Court abused its discretion in allowing even the first Alco-Sensor III test to be used as evidence of Snell's guilt at trial. Accordingly, we reverse the District Court's decision regarding the admissibility of the PAST evidence.

¶39 Once we determine the District Court abused its discretion, we next decide whether that error was harmless or whether it was prejudicial to a criminal defendant's right to a fair trial and thus, reversible. In both *Weldele* and *Crawford* we concluded the District Court abused its discretion in admitting the PAST evidence, but there were two different outcomes after we then analyzed whether the court's error was harmless or prejudicial. In *Weldele*, we

13

concluded the error was harmless and non-prejudicial. In *Crawford*, we concluded the error was prejudicial and therefore reversible.

¶40    Both *Weldele* and *Crawford* used the harmless error review set out in *State v. Van Kirk*, 2001 MT 184, 306 Mont. 215, 32 P.3d 735, and we adopt it here as well. First is an inquiry of whether the claimed error is either a "structural" or "trial" error. *Van Kirk*, ¶¶ 38-40; *Weldele*, ¶ 61; *Crawford*, ¶ 14. Presentation of PAST evidence is trial error and is thus subject to harmless error review. Next, in order to determine whether the defendant was prejudiced by the admission of such evidence, we apply the "cumulative evidence test" which determines whether the fact-finder was presented with admissible evidence that proved the same facts as the tainted evidence proved. *Van Kirk*, ¶ 43; *Weldele*, ¶ 62, *Crawford*, ¶ 15. If the tainted evidence is cumulative and is presented for the purpose of proving an element of the charged crime, the State must prove that, qualitatively, the tainted evidence was such that there was no reasonable possibility that it might have contributed to the conviction. *Van Kirk*, ¶ 44; *Weldele*, ¶ 62, *Crawford*, ¶ 15. If instead, the tainted evidence is not cumulative and is presented to prove an element of the crime, such admission is not harmless and is reversible error. *Van Kirk*, ¶ 47; *Crawford*, ¶ 15.

¶41    In *Weldele*, the tainted evidence was Weldele's PAST result, which was admitted to prove intoxication, an element of the crime with which he was charged. We noted that under *Van Kirk*, the State must demonstrate: (a) there was other cumulative admissible evidence demonstrating the "under the influence" element; and (b) that, qualitatively no reasonable possibility exists that the tainted evidence might have contributed to Weldele's conviction. *Weldele*, ¶ 63. In addition to Weldele's PAST result, there was also the arresting officer's

14

field observation and Weldele's Intoxilyzer results. We concluded the Intoxilyzer results, in itself, established the "under the influence" element, thereby rendering the PAST result "redundant, unnecessary, non-prejudicial and harmless." *Weldele*, ¶ 63.

¶42 In *Crawford*, the defendant refused the Intoxilyzer test so there were no results to present as evidence. Using the *Van Kirk* analysis, we distinguished *Weldele* and concluded the admission of PAST evidence was prejudicial despite other evidence, such as the officer's observations, Crawford's admission he had been drinking and field sobriety results. We noted the scientific nature of the PAST evidence was critical to a finding of prejudicial error:

> [T]here is a natural propensity among jurors to accord greater weight to objective scientific evidence than to subjective observations that are open to differing interpretations. If the scientific evidence is accurate and reliable, this is a desirable and fair result. However, if the scientific evidence in question has no demonstrable accuracy or reliability - as is the case with the PBT result in *Weldele* and here - then the error of its admission can have significant adverse consequences for the defendant. As we pointed out in *Weldele*, factors which affect the results of PBT tests administered in the field can produce readings that vary as much as 10%.

¶43 *Crawford*, ¶ 18. In the instant case, there was no corroborating Intoxilyzer result nor were there results from a field test. Instead, the State introduced the PAST results to prove Snell's intoxication. Other evidence included Officer Harrison's testimony regarding Snell's driving behavior, the odor of alcohol emanating from Snell, Snell's bloodshot eyes and Snell's admission that he had been drinking. Therefore, similar to *Crawford*, the PAST evidence is not cumulative and is therefore prejudicial. Under a *Van Kirk* analysis, because the State presented the PAST for the purpose of proving an element of the charged crime - intoxication - it must prove that, qualitatively, the tainted evidence of the PAST would not have contributed to the conviction. There is even less evidence available here than there was

15

in *Crawford*, therefore the State did not meet this burden. Therefore, we reverse on this issue.

## ISSUE THREE

¶44    Whether the District Court properly allowed a law enforcement officer to offer testimony regarding Snell's intoxication level even though the officer was not listed as an expert witness prior to trial.

¶45    Opinion testimony "otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Rule 704, M.R.Evid. A witness not testifying as an expert may give opinions or inferences "rationally based on the perception of the witness and . . . helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." Rule 701, M.R.Evid.

¶46    We have precedent recognizing lay witness testimony regarding a person's state of intoxication based on the witness's personal observations. *State v. Bradley* (1993), 262 Mont. 194, 198, 864 P.2d 787, 789 (a lay witness is not precluded from testifying about the state of a person's intoxication). "[T]he fact is that most adults are sufficiently experienced with people who have been drinking to offer an opinion that a person is, in fact, intoxicated from alcohol based on their personal observations." *State v. Nobach*, 2002 MT 91, ¶ 15, 309 Mont. 342, ¶ 15, 46 P.3d 618, ¶ 15.

¶47    At trial, Officer Harrison testified that based upon his observations–the odor of alcohol, Snell's bloodshot eyes and slurred speech, Snell's driving behavior–Snell was under the influence of alcohol. This type of lay witness testimony is clearly admissible. *Nobach*, ¶ 15. Therefore, we conclude the District Court did not abuse its discretion when it allowed

16

Officer Harrison to testify that Snell was under the influence of alcohol.

¶48    We reverse and remand this case to the District Court for retrial during which the State may pursue a DUI conviction utilizing admissible evidence consistent with this Opinion.

/S/ JIM REGNIER

We Concur:

/S/ PATRICIA O. COTTER
/S/ JAMES C. NELSON
/S/ W. WILLIAM LEAPHART

Justice John Warner concurring and dissenting.

¶49     I concur that Snell failed to meet his burden of proof that two of his earlier convictions were constitutionally infirm and that the District Court properly allowed testimony concerning Snell's intoxication.  I dissent from the Court's Opinion on issue two holding that the results of the PAST were improperly admitted into evidence at trial.  The District Court did not err in admitting the results of the PAST test.

¶50     In *Strizich*, we concluded that PAST evidence was inadmissible at trial as a matter of law.  *Strizich*, 286 Mont. at 11-12, 952 P.2d at 1371-72.  We based this conclusion on §§ 61-8-402, 404, MCA (1995), which made specific provisions for use of the results of a post-arrest blood/alcohol test as trial evidence; and on § 61-8-409, MCA (1995), and Rule 23.4.201(7)(b), ARM (1995), which specifically limited use of the results of PAST tests for determination of probable cause for arrest.  *Strizich*, 286 Mont. at 11, 952 P.2d at 1371.  In so concluding we stated, "that results of a [PAST] are not substantive evidence of the amount of alcohol present in a person's body, but instead are an 'estimate' of alcohol concentration for the purpose of establishing probable cause to believe that a person is under the influence of alcohol prior to making an arrest . . . ."  *Strizich*, 286 Mont. at 12, 952 P.2d at 1372.

¶51     Also in 1997, the Legislature made significant changes to the statutory scheme controlling use of PAST results at trial.  Sections 61-8-402, 404, MCA (1997), were revised; removing the provisions limiting the use of breath test results to tests given post-arrest.  Section 61-8-404(1)(b )(i), MCA (1997), was amended to specifically include PAST results as evidence admissible at trial, and now reads as follows:

(1) Upon the trial of a [DUI] . . . :

18

(b) a report of the facts and results of one or more tests of a person's blood or breath is admissible in evidence if:
(i) a breath test or *preliminary alcohol screening test* was performed by a person certified by the forensic sciences division of the department to administer the test.  [Emphasis added.]

The revisions to § 61-8-409, MCA (1997), eliminated the provision limiting the use of PAST results to probable cause determinations.  Additionally, in March 2002, the Department of Justice, Forensic Science Division, deleted Rule 23.4.201(7)(b), ARM, and part of Rule 23.4.225(1)(a), ARM, which previously had restricted use of PAST results solely as evidence of probable cause.  It is clear from these revisions that the Legislature intended, and the Department concurred, that the results of PAST tests be admissible evidence at trial, provided, of course, that a proper foundation is laid before admission.

¶52    After the 1997 amendments, this Court did not again take up an in-depth analysis of the PAST test until it decided *Weldele* in 2003.  In *Weldele*, the state produced foundation evidence regarding the PAST machine's certification and the training the officers received, but did not produce evidence tending to prove the reliability of the science underlying the PAST.  *Weldele*, ¶¶ 45, 58.  Despite the fact that no scientific evidence existed in the *Weldele* record, this Court took it upon itself to review the evidence submitted five years earlier in *Strizich*, and the legislative history of the 1997 amendments.  *See Weldele*, ¶¶ 52-54.  I agree with Justice Rice's dissent in *Weldele*, that reviewing evidence presented in a prior case was inappropriate.  *See Weldele*, ¶ 86.  The *Weldele* court should have waited until it had scientific evidence before it opined on the "statistically unreliable" nature of the PAST, especially given the fact the *Strizich* evidence was five years old by the time the *Weldele* court reviewed it.

¶53    I also disagree with the *Weldele* court's summation of the law as set forth in *Strizich*. In *Strizich*, we approved the District Court's order which determined that PAST results could not be substantive evidence at all, and stated that the District Court's decisions "were correctly based on the statutory scheme pertaining to [PAST's]. . . ." *Strizich*, 286 Mont. at 11, 952 P.2d at 1371.  Thus, we held that PAST results were inadmissible as a matter of law. *Strizich*, 286 Mont. at 12, 952 P.2d at 1372.  Then in *Weldele*, we began with a blanket statement that "the admissibility of [PAST] evidence remains the law as set forth in *Strizich*; it has not been overruled and district courts are bound by it." *Weldele*, ¶ 58.  However, we then turned around and said:

> This is not to say that we will never approve trial admission of this evidence. The State may take the opportunity at any time to establish [PAST] reliability. If the State in any given case establishes that the [PAST] results it seeks to admit are reliable and accurate, the results could then be admissible if they otherwise satisfy all other requirements for admissibility. . . . Under *Strizich*, Weldele was not obligated to prove that the [PAST] was unreliable.  Rather, the State had the burden of offering scientific and expert testimony to establish the test's reliability.

*Weldele,* ¶¶ 57-58.  So which is it?  Inadmissible as a matter of law, or admissible if proved reliable?  The point is this: in this case the majority's analysis of the PAST issue derives solely from *Strizich* and *Weldele*.  *Strizich* at a minimum has been superceded by statute and the shaky analysis of *Weldele*.  *Weldele* itself was decided on five year old evidence not before the Court.  We must give the PAST a fresh look.

¶54    Substantial scientific evidence was presented at the evidentiary hearing.  Two experts testified as to the basic fuel cell technology underlying the Alco-Sensor III device.  Both agreed that the fuel cell technology utilized by the Alco-Sensor III accurately measures

blood/alcohol content, though they differed as to what they thought were appropriate uses of the resulting measurements. State's Exhibit 8-A, entitled "Fuel Cell Technology Applied to Alcohol Breath Testing," is an article put out by Intoximeters, Inc., the manufacturer of the Alco-Sensor III, which describes the history of fuel cell technology, fuel cell construction, application of the technology to breath alcohol measurement, principles of measurement, and the mechanics of breath sampling. The article relates the improvements made to fuel cell technology since 1986 and describes the testing done on the Alco-Sensor III to ensure that the machine is accurate at low blood/alcohol concentrations. Finally, the article includes a schematic of a fuel cell configuration, and a number of graphs and charts, the most informative of which highlights the Alco-Sensor III's ability to distinguish ethanol from a variety of other chemicals.

¶55 State's Exhibit 11, a report by the U.S. Department of Transportation, entitled "The Accuracy of Evidential Breath Testers at Low BAC's," states that the Alco-Sensor III is "just as accurate at low BAC's in the 0.020-0.040% range as they were when tested at 0.050%, 0.100%, and 0.150% against the NHTSA model specifications for evidential breath testers."

¶56 State's Exhibit 7, is a chapter entitled "The Fuel Cell," from the Montana Department of Justice, Forensic Science Division's manual on blood/alcohol related issues. The chapter includes information on fuel cell construction, the basic chemistry that occurs when alcohol comes in contact with the fuel cell, the effects of temperature, age, and proper use of the fuel cell on cell performance, and methods of measurement. Two reports, one by the Mesa, Arizona, Police Department Crime Lab and the other by the Idaho Department of Health and Welfare, Forensic Section, produced after extensive field and laboratory testing, concluded

21

that the Alco-Sensor III is an accurate and reliable blood/alcohol measurement device.

¶57 Rule 702, M.R.Evid., allows a qualified expert witness to testify as to scientific evidence if the testimony will help the trier of fact understand the evidence. In *Barmeyer*, we determined:

> [a]bsolute certainty of result or unanimity of scientific opinion is not required for admissibility. . . . Unless an exaggerated popular opinion of the accuracy of a particular technique makes its use prejudicial or likely to mislead the jury, it is better to admit relevant scientific evidence in the same manner as other expert testimony and allow its weight to be attacked by cross-examination and refutation.

*Barmeyer*, 202 Mont. at 193-94, 657 P.2d at 598, *overruled on other grounds by*, *Martel v. Montana Power Co.* (1988), 231 Mont. 96, 752 P.2d 140, *(quoting United States v. Baller,* (4th Cir. 1975), 519 F.2d 463).

¶58 In 1998, we affirmed this standard concerning the general admissibility of scientific evidence stating:

> a trial court presented with scientific evidence . . . is encouraged to liberally construe the rules of evidence so as to admit all relevant expert testimony pursuant to *Barmeyer*. . . . [I]f a court is presented with an issue concerning the admissibility of scientific evidence in general, the court must employ a conventional analysis under Rule 702, M.R.Evid., while again adhering to the principle set forth in *Barmeyer*.

*Hulse v. State*, 1998 MT 108, ¶ 63, 289 Mont. 1, ¶ 63, 961 P.2d 75, ¶ 63.

¶59 After conceding in ¶ 36 that the trial court heard expert testimony and that an "extensive discussion of past technology" was held at the evidentiary hearing, the majority in this case proceeds to say, "[h]owever, the court held the evidentiary hearing in 2001, prior to our 2003 *Weldele* decision." The majority's analysis in this case is practically a verbatim quotation from *Weldele*, contains minimal additional analysis, and contains no guidance for

22

the State on what further evidence is necessary to convince the Court. The ruling here makes the assurance in *Weldele* that the evidence could be admitted empty indeed.

¶60 The defendant's own expert acknowledged that he is unaware of any additional peer review article in any scientific journal that would tend to either support or debunk the evidence submitted in this case. The quantity and quality of the scientific evidence submitted in this case provided evidence of the reliability of the Alco-Sensor III. The District Court correctly found that the PAST evidence was admissible, and that all challenges based on variables such as temperature, humidity, operator skill, air quality, etc., go to the weight of the evidence. There was no abuse of discretion in admitting the results of the PAST.

¶61 I would affirm the judgment.


/S/ JOHN WARNER

We join in the foregoing concurrence and dissent of Justice Warner.


/S/ KARLA M. GRAY

/S/ JIM RICE